IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LAURA (MESSAMORE) GRABOWSKI, ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | CV 03-J-216-S |
| THE AIG LIFE INSURANCE ) COMPANIES d/b/a AIG LIFE ) INSURANCE COMPANY, et al., ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Pending before the court are two motions for summary judgment: defendant AIG Life Insurance Company's ("AIG") motion (doc. 21) and defendants St. Vincent's Hospital and Ascension Health's (collectively "St. Vincent") motion (doc. 20). The court has reviewed the motions and the parties' other submissions. Based upon this review, the court is of the opinion that the motions are due to be granted.

### I. Background

Plaintiff's husband, Preston Messamore ("the insured"), died on April 13, 2000. At the time of his death, plaintiff was listed as the beneficiary of an accidental death and disability policy ("AD&D policy") under which Preston Messamore was the insured. The policy was offered under a voluntary personal accident insurance

plan ("the Plan") by plaintiff's employer, St. Vincent's, as a benefit of employment. The Plan is funded through employee contributions, Exhibit 1 to St. Vincent's Motion at ¶ 2, and the group accident insurance policy is underwritten by AIG, Exhibit 1(a) to St. Vincent's Motion at St. V 166. Daughters of Charity National Health System, Inc. is listed as the policyholder and plan administrator for the plan. Exhibit 1(a) to St. Vincent's Motion at St. V 192. On or about November 1, 2000, plaintiff filed a claim for benefits under the AD&D policy. AIG's Evidentiary Submissions (doc. 22) at AIG 499-500. AIG denied benefits after concluding that the manner of death was not covered under the Plan. *See* Exhibit 1(c) to St. Vincent's Motion at St. V 114-116. Plaintiff filed an appeal on September 24, 2001, *see* Exhibit 1(c) to St. Vincent's Motion at St. V 117-119, which was heard by AIG's ERISA Appeals Committee on February 13, 2002, *see* Exhibit 1(c) to St. Vincent's Motion at St. V 130. The Committee upheld the denial of benefits. *See* Exhibit 1(c) to St. Vincent's Motion at St. V 131-132.

    The police report indicates that the plaintiff arrived home from work to find the insured lying on the floor of their home. Autopsy Report, Exhibit 8 to Plaintiff's Evidentiary Submissions (doc. 27). She called 911 and the insured was pronounced dead at the scene. *Id*. "A needle and a spoon with white powder were found on the counter three feet from where the dec[edent] was lying. Tissue paper with blood on

it was also noted on the counter." *Id.* The Certificate of Death indicates "intravenous methadone abuse" as the immediate cause of death and "accident" as the manner of death. Exhibit 1(c) to St. Vincent's Motion at St. V 66. The autopsy report is consistent with the death certificate but contains the following further relevant information:

> Examination revealed the presence of multiple acute appearing needle puncture marks in the right antecubital fossa. Of note, discovered near the decedent was a syringe, a separate syringe needle which was capped, and a ladle. Analysis of the ladle, syringe, and the residue around the base of the separate capped needle revealed the presence of methadone[1]. . . . Also present was moderate pulmonary edema. Although nonspecific, pulmonary edema as such as [sic] the decedent had is commonly seen in drug related deaths. There was also prominent foreign body granulomata within the lungs which is strongly suggestive of past intravenous drug abuse. . . . [T]he decedent has a peripheral blood methadone level of .51mg/L with a liver level of 2.5mg/kg. The decedent had 23.5mg of methadone in his gastric contents. Though the decedent had a prescription for methadone, and presumably had some tolerance to it, these blood levels nevertheless are potentially fatal, particularly in someone who is abusing methadone intravenously such as the decedent was.

Autopsy Report, Exhibit 8 to Plaintiff's Evidentiary Submissions (doc. 27). A note from the coroner at the scene indicates several bottles of medication, including

---

[1] Plaintiff disputes the coroner's conclusion as to the presence of methadone on the ladle and syringes based on the absence of a toxicology report. However, plaintiff does not present any evidence to contradict the coroner's conclusion.

prescription number 317940 for methadone filled on March 24, 2000. Exhibit 10 to Plaintiff's Evidentiary Submissions. The label indicates that the prescription for 300 pills was filled and the instructions indicate that two (2) pills were to be taken four (4) times a day.[2] *Id.* The coroner noted that 68 pills were left in the bottle.[3] *Id.* Plaintiff also produced a copy of the bottle label which supports the information noted by the coroner with respect to the date the prescription was filled and the number of pills. AIG's Evidentiary Submissions at AIG 76. According to the police report, plaintiff denied drug abuse by the insured. Plaintiff submitted an affidavit stating that she was never aware of drug abuse or intravenous injection of methadone by the insured. Exhibit 3 to Plaintiff's Evidentiary Submissions at ¶ 5. In the report

---

[2] Plaintiff argues that the prescription was "silent as to the administration route of the pills." However, plaintiff also argues that the insured's blood methadone level was consistent with someone taking the pills orally. Moreover, one of the articles relied on by plaintiff points out that, while the practice of prescribing injectable methadone is primarily limited to Great Britain, methadone solutions are available for intravenous administration. Exhibit 14 to Plaintiff's Evidentiary Submissions at 1185. Therefore, absent evidence to the contrary, the fact that tablets were prescribed shows an intent that the drug be administered orally.

[3] This evidence indicates that the insured had taken more than the prescribed amount of methadone. Assuming that the insured took the pills from the day the prescription was filled through the day of his death, if taken according to instruction, the insured would have taken approximately 168 pills (leaving 132 pills out of the 300 originally in the bottle). However, only 68 pills were left indicating that the insured had already used 232 pills, 64 more than the prescribed amount. Note, plaintiff asserts that the insured's prescription instructed that he take 2.5 pills 4 times a day, or a total of ten pills per day. However, plaintiff bases this assertion on a letter written in August of 1999 by the insured's doctor stating that "[t]he methadone was titrated over a period of time to 25 mg. q.i.d." which predates the March, 2000 prescription at issue.

4

issued, pursuant to AIG's request, by the International Institute of Forensic Science on May 31, 2001, Dr. James Lewis, forensic pathologist, opines that "the cause of death is due to acute reaction to intravenous methadone; due to chronic drug abuse." AIG's Evidentiary Submissions at AIG 148. Dr. Lewis further opines that "this is a self inflicted injury"; that "[t]he drugs which caused Mr. Messamore's death were abused and not at physician prescribed levels"; and that "chronic drug abuse, diabetes mellitus, heart disease, lung disease, thyroid disease and kidney disease" were "pre-existing conditions that contributed to his death." *Id.* at AIG 148-9. Guy Purnell, forensic toxicologist, opines that "Mr. Messamore's death was caused by an acute overdose of prescribed medication, more specifically methadone." Letter dated May 28, 2001, AIG's Evidentiary Submissions at AIG 151. Dr. Bruce Goldman's report to the International Institute of Forensic Science states that "[he] agree[s] with the Medical Examiner's conclusion that the immediate cause of death is methadone toxicity from intravenous methadone abuse. The lung pathology is consistent with both previous intravenous drug use and acute narcotic toxicity." Letter dated April 15, 2001, AIG's Evidentiary Submissions at AIG 153.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-moving party to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro. 56(e). In meeting this burden the non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must

demonstrate that there is a "genuine issue for trial." Fed. R. Civ. Pro. 56(c); *Matsushita*, 475 U.S. at 587. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case...A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000), quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). A factual dispute regarding a non-material issue will not preclude the defendant from succeeding on a motion for summary judgment. *Brown v. American Honda Motor Co.*, 939 F.2d 946, 953 (11th Cir. 1991).

### III. Legal Analysis

Plaintiff's Verified Complaint (doc. 1) contains the following counts asserting state law claims against St. Vincent[4]: (I) breach of contract; (II) fraud; (III) suppression; (IV) deceit; (V) conspiracy; and (VI) bad faith. Plaintiff's Amended

---

[4] These state law claims have already been dismissed with respect to defendant AIG pursuant to the court's order on February 18, 2003 (doc. 11). Thus, the state law claims against defendants St. Vincent's Hospital and Ascension Health are the only ones left to be considered pursuant to the motions currently pending.

Complaint (doc. 15) adds the following counts asserting claims against AIG and St. Vincent under ERISA: (VII) ERISA violation; (VIII) ERISA violation due to an illegal claims process; (IX) ERISA violation due to failure to provide benefits; (X) violation of Title I, Part 1 of ERISA; and (XI) violation of Title I, Part 4 of ERISA.

However, Plaintiff failed to address the following claims in her response to defendants' motions for summary judgment: (I) breach of contract; (II) fraud; (III) suppression; (IV) deceit; (V) conspiracy; (VI) bad faith; and (X) violation of Title I, Part 1 of ERISA . Thus, plaintiff has abandoned these claims and they are due to be dismissed. *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1284 (11th Cir. 2003); *see also Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001).

Counts VII, VIII and IX essentially assert the same claim of a failure to pay benefits. Under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B),

> A civil action may be brought–
> (1) by a participant or beneficiary–
> ...
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

Plaintiff seeks to recover benefits allegedly due to her under the Plan based on her claim for benefits for the loss of her husband.

Plaintiff has asserted claims against the insurer and the employer. The party administering the plan can be held liable for ERISA violations. *Rosen v. TRW, Inc.*, 979 F.2d 191, 193-4 (11th Cir. 1992). "Proof of who is the plan administrator may come from the plan document, but can also come from the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation in the plan document." *Hamilton v. Allen-Bradley Co., Inc.*, 244 F.3d 819, 824 (11th Cir. 2001). A party qualifies as a plan administrator if it "had sufficient decisional control over the claim process." *Id.* None of the defendants assert that they were not the plan administrator.[5]

The court must review ERISA determinations and decisions under one of three possible standards of review. Where an ERISA plan does not grant discretion over the distribution of plan benefits to the administrator, the court must apply a *de novo* standard of review. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The AD&D policy does not expressly grant AIG discretion in disbursing insurance benefits. Accordingly, the *de novo* standard of review applies to AIG's decision to deny plaintiff's claim for insurance benefits. As a result, the court's review is not limited to the evidence present before the administrator at the time of

---

[5] The summary plan description identifies Ascension Health's predecessor, Daughters of Charity National Health System, as plan administrator. However, AIG was responsible for reviewing claims.

its determination. *See Moon v. American Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir. 1989).

Under the *de novo* standard, the court must interpret the language of the Plan and apply it to the facts to determine whether plaintiff was entitled to benefits. *See Moon*, 888 F.2d at 89. The relevant language of the Plan provides the following:

> **Injury** - means bodily injury caused by an accident occurring while the Policy is in force as to the person whose injury is the basis of claim and resulting directly and independently of all other causes in a covered loss.
> ....
> If Injury to the Insured Person results in death within 365 days of the date of the accident that caused the Injury, the Insurance Company will pay 100% of the Principal Sum.
> ....
> The Policy does not cover any loss caused by in whole or in part by, or resulting in whole or in part from, the following:
> 1. suicide or any attempt at suicide or intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury;
> ....
> 6. the Insured Person being under the influence of drugs or intoxicants, unless taken under the advice of a Physician;

Exhibit 1(a) to St. Vincent's Motion at St. V 168, 173, 186.

Defendants argue that the denial of benefits was proper under three possible theories: (1) the insured's death was not caused by an "accident"; (2) the insured's death resulted in part from the insured being under the influence of drugs not taken

10

under the advice of a physician; or (3) the insured's death resulted in part from an intentionally self-inflicted injury. As discussed below, the court finds that the insured's death resulted in part from the insured being under the influence of drugs not taken under the advice of a physician. Thus, the court declines to discuss the other theories asserted by defendants.

Even if the insured's death was found to have been accidental,[6] the Plan's exclusions may still require a denial of benefits. The Plan excludes injuries which resulted in part from the insured being under the influence of drugs not taken under the advice of a physician. *See* Exhibit 1(a) to St. Vincent's Motion at St. V 186. The undisputed evidence reveals that intravenous methadone abuse was the immediate cause of death, Exhibit 1(c) to St. Vincent's Motion at St. V 66 and AIG's Evidentiary Submissions at AIG 148, 153, and methadone is clearly a drug. While the insured had a prescription for methadone, there is no evidence that the method and amount of methadone which caused his death was taken under the advice of a physician. Dr. Shehi prescribed that the insured take two (2) pills four (4) times a day orally and the evidence shows that the insured was injecting methadone and his consumption of methadone averaged more than eleven (11) pills a day as opposed to

---

[6] The court finds that a genuine issue of material fact exists as to whether the insured's death was accidental.

the eight (8) pills a day prescribed by his doctor. *See* Exhibit 10 to Plaintiff's Evidentiary Submissions. As previously noted, Plaintiff makes some factual assertions contrary to this evidence. However, she does not provide any evidentiary support for her assertions. Based on the undisputed facts, the court concludes as a matter of law that the insured's death resulted in part from his being under the influence of drugs not taken under the advice of a physician. Under this exclusion, counts VIII and IX are due to be dismissed.

Count XI asserts a claim for breach of fiduciary duty resulting from the failure to pay benefits. Two provisions of ERISA, sections 502(a)(2) and 502(a)(3), provide for a private cause of action based on a breach of fiduciary duty. However, individuals who sue under section 502(a)(2) may do so only on behalf of the plan as a whole. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985). A cause of action under section 502(a)(3) is also limited in that the provision only provides equitable relief "for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 490 (1996).

While plaintiff's amended complaint (doc. 15) does not specify the section under which she asserts her claim for breach of fiduciary duty, plaintiff's claim fails under either provision. First, a claim under section 502(a)(2) fails because plaintiff seeks damages on her own behalf and not on behalf of the plan as a whole. Second,

12

a claim under section 502(a)(3) fails because plaintiff seeks damages for defendants' failure to pay benefits and ERISA provides adequate relief for plaintiff's alleged injury elsewhere (under section 502(a)(1)(B)). *See Katz v. Comprehensive Plan of Group Ins.*, 197 F.3d 1084, 1088 (11th Cir. 1999). Therefore, plaintiff's amended complaint fails to state a claim for breach of fiduciary duty for which relief may be granted and this count is due to be dismissed.

## IV. Conclusion

Based upon the foregoing, St. Vincent's and AIG's motions for summary judgment (docs. 20 & 21) are **GRANTED**. Plaintiff's claims against the defendants shall be **DISMISSED WITH PREJUDICE** by separate order.

**DONE** and **ORDERED** this the _26_ day of September, 2003.

_____
Inge P. Johnson
U.S. District Judge